**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MISSOURI**

| | | |
|---|---|---|
| STEPHANIE DOSS, BETHANY MILLER, and AIMEE JARVIS, individually and on behalf of all others similarly situated, | ) | |
| Plaintiffs, | ) | |
| v. | ) | Case No. |
| AT&T INC.<br>Serve Registered Agent:<br>CT Corporation System<br>1999 Bryan St., Ste. 900<br>Dallas, TX 75201 | ) | |
| Defendant. | ) | |

**CLASS ACTION COMPLAINT**

COME NOW Plaintiffs Stephanie Doss, Bethany Miller, and Aimee Jarvis, individually and on behalf of all others similarly situated, and on behalf of the general public, upon personal knowledge of facts pertaining to them and upon information and belief as to all other matters, and by and through undersigned counsel, hereby brings this Class Action Complaint against Defendant, AT&T Inc. (hereinafter, "ATT" and/or "Defendant"), and allege as follows:

**INTRODUCTION**

1. Plaintiffs bring this action on behalf of themselves, and all other individuals similarly situated ("Class Members") against Defendant for its failure to secure and safeguard the personally identifiable information ("PII") of over 70 million individuals who are customers of the company.[1]

---

[1] https://apnews.com/article/att-data-breach-dark-web-passcodes-fbef4afe0c1deec9ffb470f2ec134f41

2. ATT headquartered in Dallas, Texas is one of the world's largest telecommunication companies, providing telecommunications goods and services. In the regular course of its business, ATT is required to maintain reasonable and adequate security measures to secure, protect, and safeguard their customers' PII against unauthorized access and disclosure.

3. Defendant could have prevented the Data Breach by properly monitoring their file software.

4. Every year, millions of Americans have their most valuable PII stolen and sold online because of data breaches. Despite the dire warnings about the severe impact of data breaches on Americans of all economic strata, companies still fail to make the necessary investments to implement important and adequate security measures to protect their customers' and employees' data.

5. Defendant required its customers to provide it with their sensitive PII and failed to protect it. Defendant had an obligation to secure their customers' PII by implementing reasonable and appropriate data security safeguards. This was part of the bargain between Plaintiffs and Class Members and Defendant.

6. As a result of Defendant's failure to provide reasonable and adequate data security, Plaintiffs' and the Class Members' unencrypted, non-redacted PII has been exposed to unauthorized third parties. Plaintiffs and the Class are now at much higher risk of identity theft and cybercrimes of all kinds, especially considering the highly sensitive PII stolen here and the fact that the compromised PII is already being sold on the dark web. This risk constitutes a concrete injury suffered by Plaintiffs and the Class as they no longer

have control over their PII, which PII is now in the hands of third-party cybercriminals. This substantial and imminent risk of identity theft has been recognized by numerous courts as a concrete injury sufficient to establish standing.

7. Plaintiffs and the Class will have to incur costs to pay a third-party credit and identity theft monitoring service for the rest of their lives as a direct result of the Data Breach.

8. Plaintiffs bring this action on behalf of themselves and those similarly situated to seek redress for the lifetime of harm they will now face, including, but not limited to, reimbursement of losses associated with identity theft and fraud, out-of-pocket costs incurred to mitigate the risk of future harm, compensation for time and effort spent responding to the Data Breach, the costs of extending credit monitoring services and identity theft insurance, and injunctive relief requiring Defendant to ensure that they implement and maintain reasonable data security practices going forward.

## THE PARTIES

9. Plaintiff Stephanie Doss is a resident of Kansas City, Platte County, Missouri, whose Personal Information was compromised in the Data Breach.

10. Plaintiff Bethany Miller is a resident of Lee's Summit, Jackson County, Missouri, whose Personal Information was compromised in the Data Breach.

11. Plaintiff Aimee Jarvis is a resident of Gardner, Johnson County, Kansas, whose Personal Information was compromised in the Data Breach.

12. Defendant ATT is a Delaware formed company headquartered in Dallas, Texas.

## JURISDICTION AND VENUE

13. This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. §1332(d) because there are more than 100 Class Members, at least one class member is a citizen of a state different from that of Defendant, and the amount in controversy exceeds $5 million, exclusive of interest and costs.

14. Venue is likewise proper in this District pursuant to 28 U.S.C. § 1391(b) because Defendant conducts much of their business in this District and Defendant has caused harm to Class Members residing in this District.

## GENERAL ALLEGATIONS COMMON TO ALL COUNTS

15. This is a class action brought by Plaintiffs, individually and on behalf of all citizens who are similarly situated (i.e., the Class Members), seeking to dress Defendant's willful and reckless and violations of their privacy rights. Plaintiffs and the other Class Members were customers of Defendant.

16. For an unspecified period of time, unauthorized third parties accessed and downloaded Plaintiffs' and the Class Members' PII. *Id.*

17. This action pertains to Defendant's unauthorized disclosures of the Plaintiffs' PII from prior to 2019. It is unclear if this Breach originated from ATT or one of its vendors. [2]

[2] https://apnews.com/article/att-data-breach-dark-web-passcodes-fbef4afe0c1deec9ffb470f2ec134f41

18. Defendant disclosed Plaintiffs' and the other Class Members' PII to unauthorized persons as a direct and/or proximate result of Defendant's failure to safeguard and protect their PII.

19. By obtaining, collecting, and storing the PII of Plaintiffs and Class Members, Defendant assumed legal and equitable duties and knew or should have known it was responsible for protecting the PII from unauthorized disclosures.

20. Plaintiffs and Class Members have taken reasonable steps to maintain the confidentiality of their PII and relied on Defendant to keep their PII confidential and maintained securely, to use this information for business purposes only, to make only authorized disclosures of this information, and to ensure that any third-party vendors take similar steps.

### ***The Data Breach***

21. According to an announcement by ATT, ("Breach Notice"), "a dataset found on the "dark web" contains information such as Social Security numbers for about 7.6 million current AT&T account holders and 65.4 million former account holders." [3]

22. The PII disclosed in the Data Breach included passcodes, Social Security Numbers, email addresses, mailing addresses, phone numbers, and birth dates. *Id.*

23. Absent from the Breach Notice are any details regarding how the Data Breach happened, what Defendant did in response to the ransom demand, or how Defendant's actions have remediated the root cause of the Data Breach.

### ***The Data Breach was Preventable***

[3] *Id.*

24. Had Defendant ATT insured that they maintained industry-standard safeguards to monitor, assess, and update security controls and related system risks, Defendant could have ensured sensitive customer data was not transferred to a vendor that was unequipped to protect it. Defendant's lack of oversight of its security controls, and implementation of enhanced security measures only after the Data Breach are inexcusable.

25. Defendant was at all times fully aware of its obligation to protect its customers' PII and the risks associated with failing to do so. Defendant observed frequent public announcements of data breaches affecting finance and insurance industries and knew that information of the type collected, maintained, and stored by Defendant is highly coveted and a frequent target of hackers.

26. This exposure, along with the fact that the compromised PII is already being sold on the dark web, is tremendously problematic. Cybercrime is rising at an alarming rate, as shown in the FBI's Internet Crime Complaint statistics chart shown below:



28. Stolen PII is often trafficked on the dark web, as is the case here. Law enforcement has difficulty policing the dark web due to this encryption, which allows users and criminals to conceal identities and online activity.

29. When malicious actors infiltrate companies and copy and exfiltrate the PII that those companies store, that stolen information often ends up on the dark web because the malicious actors buy and sell that information for profit.[5]

30. In April 2023, NationsBenefits, "disclosed that thousands of its members had their personal information compromised in a late-January ransomware attached targeting Fortra's Anywhere platform, a file-transfer software that the firm was using. According to the news reports, the ransomeware gang CLOP claimed responsibility for the attack, saying it took advantage of a previously known vulnerability."[6]

31. In mid-April 2023, "the second largest health insurer [Point32Health], in Massachusetts, suffered major technical outages resulting from a ransomware attack. The incident brought down the company's systems that it uses to service members and providers, resulting in some members having difficulty contacting their insurers."[7]

32. In May 2023, MCNA Insurance Company disclosed that "personal health information of nearly nine million patients was compromised in a cyber incident discovered in March. In a data breach notification letter filed with the Maine state attorney general's office dated May 26, the firm said that it detected unauthorized access

---

[5] *Shining a Light on the Dark Web with Identity Monitoring*, IdentityForce, Dec. 28, 2020, *available at:* https://www.identityforce.com/blog/shining-light-dark-web-identity- monitoring (last accessed July 28, 2021).

[6] https://www.insurancebusinessmag.com/us/guides/the-insurance-industry-cyber-crime-report-recent-attacks-on-insurance-businesses-448429.aspx (Last visited August 22, 2023)

[7] *Id.*

to its systems on March 6, with some found to be infected with malicious code…According to MCNA, the hackers were successful in accessing patient personal information."[8]

33. In April 2020, ZDNet reported in an article titled, "Ransomeware mentioned in 1,000+ SEC filings over the past year", that "[r]ansomeware gangs are now ferociously aggressive in their pursuit of big companies. They breach networks, use specialized tools to maximize damage, leak corporate information on dark web portals, and even tip journalists to generate negative news complaints as revenge against those who refuse to pay."[9]

34. In September 2020, the United States Cybersecurity and Infrastructure Security Agency published online a "Ransomeware Guide" advising that "[m]alicious actors have adjusted their ransomeware tactics over time to include pressuring victims for payment by threatening to release stolen data if they refuse to pay and publicly naming and shaming victims as secondary forms of extortion."[10]

35. Another example is when the U.S. Department of Justice announced its seizure of AlphaBay in 2017. AlphaBay had more than 350,000 listings, many of which concerned stolen and fraudulent documents that could be used to assume another person's identity. Other marketplaces, similar to the now-defunct AlphaBay, "are awash with [PII] belonging to victims from countries all over the world. One of the key challenges of

---

[8] *Id.*
[9] https://www.zdnet.com/article/ransomeware-mentioned-in-1000-sec-filings-over-the-past-year/ (Last visited August 22, 2023).
[10] https://www.cisa.gov/sites/default/files/2023-01-CISA_MS-ISAC_Ransomware%20Guide_8508C.pdf (Last visited August 22, 2023).

protecting PII online is its pervasiveness. As data breaches in the news continue to show, PII about employees, customers, and the public is housed in all kinds of organizations, and the increasing digital transformation of today's businesses only broadens the number of potential sources for hackers to target."[11]

36. The PII of consumers remains of high value to criminals, as evidenced by the price they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, personal information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[12] Experian reports that a solen credit or debit card number can sell for $5 to $110 on the dark web.[13] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[14]

37. Social Security numbers, for example, are among the worst kind of personal information to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change. The Social Security Administration stresses that the loss of an individual's Social Security number, as is the case here, can lead to identity theft and extensive financial fraud:

---

[11] *Stolen PII & Ramifications: Identity Theft and Fraud on the Dark Web*, Armor, April 3, 2018, *available at:* https://www.armor.com/resources/blog/stolen-pii-ramifications- identity-theft-fraud-dark-web/ (Last visited July 28, 2021).

[12] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct. 16, 2019, *available at*: https://www.digitaltrends.com/computing/personal- data-sold-on-the-dark-web-how-much-it-costs/ (Last visited July 28, 2021).

[13] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian, Dec. 6, 2017, *available at*: https://www.experian.com/blogs/ask- experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (Last visited July 28, 2021).

[14] *In the Dark*, VPNOverview, 2019, *available at*: https://vpnoverview.com/privacy/anonymous-browsing/in-the- dark/ (Last visited July 28, 2021).

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number assuming your identity can cause a lot of problems.[15]

38. What is more, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventative action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraudulent activity to obtain a new number.

39. Even then, a new Social Security number may not be effective. According to July Ferguson of the Identity Theft Resource Center, "The credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[16]

40. Because of this, the information comprised in the Data Breach here is significantly more harmful to lose than the loss of, for example, credit card information in a retailer payment card breach because victims can simply cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change.

[15] Social Security Administration, *Identity Theft and Your Social Security Number*, *available at*: https://www.ssa.gov/pubs/EN-05-10064.pdf (Last visited August 22, 2023).
[16] Bryan Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), *available at*: http://www.npr.org/2015/02/09/384875839/data-stolen- by-anthem-s-hackers-has-millionsworrying- about-identity-theft (last visited July 28, 2021).

41. The PII compromised in the Data Breach demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, “Compared to credit card information, personally identifiable information and Social Security numbers are worth more than 10 times on the black market.”[17]

42. Once PII is sold, it is often used to gain access to various areas of the victim’s digital life, including bank accounts, social media, credit card, and tax details. This can lead to additional PII being harvested from the victim, as well as PII from family, friends, and colleagues of the original victim.

43. According to the FBI’s Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses in 2019, resulting in more than $3.5 billion in losses to individuals and business victims.

44. Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

45. Data breaches facilitate identity theft as hackers obtain consumers’ PII and thereafter use it to siphon money from current accounts, open new accounts in the names of their victims, or sell consumers’ PII to others who do the same.

46. For example, the United States Government Accountability Office noted in a June 2007 report on data breaches (the “GAO Report”) that criminals use PII to open

---

[17] Time Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT World, (Feb. 6, 2015), *available at*: https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells- for- 10x-price-of-stolen-credit-card-numbers.html (last visited July 28, 2021).

financial accounts, receive government benefits, and make purchases and secure credit in a victim's name.[18] The GAO Report further notes that this type of identity fraud is the most harmful because it may take some time for a victim to become aware of the fraud, and can adversely impact the victim's credit rating in the meantime. The GAO Report also states that identity theft victims will fact, "substantial costs and inconveniences repairing damage to their credit records… [and their] good name."[19]

47. The exposure of Plaintiffs' and Class Members' PII to cybercriminals will continue to cause substantial risk of future harm, including identity theft, that is continuing and imminent in light of the many different avenues of fraud and identity theft utilized by third-party cybercriminals to profit off this highly sensitive information.

***Defendant Failed to Comply with the Federal Trade Commission***

48. Federal and State governments have established security standards and issued recommendations to minimize data breaches and the resulting harm to individuals and financial institutions. The Federal Trade Commission ("FTC") has issued numerous guides for businesses that highlight the importance of reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[20]

---

[18] *See* Government Accountability Office, *Personal Information: Data Breaches are Frequent, but Evidence of Resulting Identity Theft is Limited; However, the Full Extent is Unknown* (June 2007), https://www.gao.gov/assets/gao- 07-737.pdf (last visited July 28, 2021).
[19] *Id.*
[20] *See* Federal Trade Commission, *Start With Security* (June 2015), https://www.ftc.gov/system/files/documents/plain- language/pdf0205-startwithsecurity.pdf (last visited July 28, 2021).

49. In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business,* which established guidelines for fundamental data security principals for business.[21] Among other things, the guidelines note businesses should properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted form the system; and have a response plan ready in the event of a breach.[22]

50. Additionally, the FTC recommends that companies limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[23]

51. Highlighting the importance of protecting against phishing and other types of data breaches, the FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect PII, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission

---

[21] *See* Federal Trade Commission, *Protecting Personal Information: A Guide for Business* (Oct. 2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited August 22, 2023).
[22] *Id.*
[23] Federal Trade Commission, *Start With Security*, *supra footnote 17*.

Act ("FTC Act"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

***The Impact of Data Breach on Victims***

52. Defendant's failure to keep Plaintiffs' and Class Members' PII secure has severe ramifications. Given the highly sensitive nature of the PII stolen in the Data Breach, passcodes, Social Security Numbers, email addresses, mailing addresses, phone numbers, and birth dates, hackers can commit identity theft, financial fraud, and other identity-related fraud against Plaintiffs and Class Members now and into the indefinite future. As a result, Plaintiffs have suffered injuries and faces an imminent and substantial risk of further injury including identity theft and related cybercrimes due to the Data Breach.

53. The PII exposed in the Data Breach is highly coveted and valuable on underground markets. Identity thieves can use the PII to: (a) commit insurance fraud; (b) obtain a fraudulent driver's license or ID card in the victim's name; (c) obtain fraudulent government benefits; (d) file a fraudulent tax return using the victim's information; (e) commit medical and healthcare-related fraud; (f) access financial and investment accounts and records; (g) engage in mortgage fraud; and/or (h) commit any number of other frauds, such as obtaining a job, procuring housing, or giving false information to police during an arrest.

54. Further, malicious actors often wait months or years to use the PII obtained in data breaches, as victims often become complacent and less diligent in monitoring their accounts after a significant period has passed. These bad actors will also

re-use stolen PII, meaning individuals can be victims of several cybercrimes stemming from a single data breach.

55. Given the confirmed exfiltration of Defendant's customers' PII from ATT, many victims of the Data Breach have likely already experienced significant harms as the result of the Data Breach, including, but not limited to, identity theft and fraud. Plaintiffs and Class Members have also spent time, money, and effort dealing with the fallout of the Data Breach, including purchasing credit monitoring services, reviewing financial and insurance statements, checking credit reports, and spending time and effort searching for unauthorized activity.

56. It is no wonder, then, that identity theft exacts a severe emotional toll on its victims. The 2021 Identity Theft Resource Center survey evidences the emotional suffering experienced by victims of identity theft:

- 84% reported anxiety;
- 76% felt violated;
- 32% experienced financial related identity problems;
- 83% reported being turned down for credit or loans;
- 32% reported problems with family members as a result of the breach;
- 10% reported feeling suicidal.[24]

[24] https://www.idtheftcenter.org/wp-content/uploads/2021/09/ITRC_2021_Consumer_Aftermath_Report.pdf (Last visited August 22, 2023).

57. Identity theft can also exact a physical toll on its victims. The same survey reported that respondents experienced physical symptoms stemming from their experience with identity theft:

- 48% reported sleep disturbances;
- 37.1% reported an inability to concentrate/lack of focus;
- 28.7% reported they were unable to go to work because of physical symptoms;
- 23.1 reported new physical illnesses (aches and pains, heart palpitations, sweating, stomach issues); and
- 12.6% reported a start or relapse into unhealthy or addictive behaviors.[25]

58. Annual monetary losses from identity theft are in the billions of dollars. According to a Presidential Report on identity theft produced in 2007:

> In addition to the losses that result when identity thieves fraudulently open accounts…individual victims often suffer indirect financial costs, including the costs incurred in both civil litigation initiated by creditors and in overcoming the many obstacles they face in obtaining or retaining credit. Victims of non-financial identity theft, for example, health-related or criminal record fraud, face other types of harm and frustration.
>
> In addition to out-of-pocket expenses that can reach thousands of dollars for the victims of new account identity theft, and the emotional toll identity theft can take, some victims have to spend what can be a considerable amount of time to repair the damage caused by the identity thieves. Victims of new account identity theft, for example, must correct fraudulent information in their credit reports and monitor their reports for future inaccuracies, close existing bank accounts and open new ones, and dispute charges with individual creditors.

[25] *Id.*

59. The unauthorized disclosure of sensitive PII to data thieves also reduces its inherent value to its owner, which has been recognized by courts as an independent form of harm.[26]

60. Consumers are injured every time their data is stolen and traded on underground markets, even if they have been victims of previous data breaches. Indeed, the dark web is comprised of multiple discrete repositories of stolen information that can be aggregated together or accessed by different criminal actors who intent to use it for different fraudulent purposes. Each data breach increases the likelihood that a victim's personal information will be exposed to more individuals who are seeking to misuse it at the victim's expense.

61. As a result of the wide variety of injuries that can be traced to the Data Breach, Plaintiffs and Class Members have and will continue to suffer economic loss and other actual harm for which they are entitled to damages, including, but not limited to, the following:

a. The unconsented disclosure of confidential information to a third party;
b. Unauthorized use of their PII without compensation;
c. Losing the value of the explicit and implicit promises of data security;
d. Losing the value of access to their PII permitted by Defendant without their permission;

---

[26] *See In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 440 F. Supp. 3d 447, 462 (D. Md. 2020) ("Neither should the Court ignore what common sense compels it to acknowledge—that the value that personal identifying information has in our increasingly digital economy. Many companies, like Marriott, collect personal information. Consumers too recognize the value of their personal information and offer it in exchange for goods and services.").

e. Identity theft and fraud resulting from the theft of their PII;

f. Costs associated with the detection and prevention of identity theft and unauthorized use of their financial accounts;

g. Anxiety, emotional distress, and loss of privacy;

h. The present value of ongoing credit monitoring and identity theft protection services necessitated by the Data Breach;

i. Unauthorized charges and loss of use of and access to their accounts;

j. Lowered credit scores resulting from credit inquiries following fraudulent activities;

k. Costs associated with time spent and the loss of productivity or the enjoyment of one's life from taking time to address and attempt to mitigate and address the actual and future consequences of the Data Breach, including searching for fraudulent activity, imposing withdrawal and purchase limits on compromised accounts, and the stress, nuisance, and annoyance of dealing with the repercussions of the Data Breach; and

l. The continued, imminent, and certainly impending injury flowing from potential fraud and identity theft posed by their PII being in the possession of one or more unauthorized third parties.

62. Even in instances where an individual is reimbursed for a financial loss due to identity theft or fraud, that does not make that individual whole again as there is typically significant time and effort associated with seeking reimbursement. The Department of Justice's Bureau of Justice Statistics found that identity theft victims, "reported spending an average of about 7 hours clearing up the issues" relating to identity theft or fraud.[27]

---

[27] E. Harrell, U.S. Department of Justice, *Victims of Identity Theft, 2014* (revised Nov. 14, 2017), http://www.bjs.gov/content/pub/pdf/vit14.pdf (Last visited August 22, 2023).

63. Plaintiffs and Class Members place significant value in data security. According to a survey conducted by cyber-security company FireEye Mandiant, approximately 50% of consumers consider data security to be a main or important consideration when making purchasing decisions and nearly the same percentage would be willing to pay more to work with a provider that has better data security. Seventy percent of consumers would provide less personal information to organizations that suffered a data breach.[28]

64. Plaintiffs and Class Members have a direct interest in Defendant's promises and duties to protect their PII, i.e., that Defendant *not increase* their risk of identity theft and fraud. Because Defendant failed to live up to its promises and duties in this respect, Plaintiffs and Class Members seek the present value of ongoing identity protection services to compensate them for the present harm and present and continuing increased risk of harm caused by Defendant's wrongful conduct. Through this remedy, Plaintiffs seeks to restore themselves and Class Members as close to the same position as they would have occupied but for Defendant's wrongful conduct, namely its failure to adequately protect Plaintiffs' and the Class Members' PII.

65. Plaintiffs and Class Members further seek to recover the value of the unauthorized access to their PII permitted through Defendant's wrongful conduct. This measure of damages is analogous to the remedies for the unauthorized use of intellectual property. Like a technology covered by a trade secret or patent, use or access to a

---

[28] https://web.archive.org/web20220205174527/https://www.fireeye.com/blog/executive-perspective/2016/05/beyong_the_bottomli.html (Last visited August 15, 2023).

person's PII is non-rivalrous—the unauthorized use by. Another does not diminish the rights-holder's ability to practice the patented invention or use the trade-secret protected technology. Nevertheless, a Plaintiffs may generally recover the reasonable use of the value of the IP—i.e., a "reasonable royalty" from an infringer. This is true even though the infringer's use did not interfere with the owner's own use (as in the case of a nonpracticing patentee) and even though the owner would not have otherwise licensed such IP to the infringer. A similar royalty or license measure of damages is appropriate here under common law damages principles authorizing recovery of rental or use value. This measure is appropriate because: (a) Plaintiffs and Class Members have a protectible property interest in their PII; (b) the minimum damages measure for the unauthorized use of personal property is its rental value; (c) rental value is established with reference to market value, i.e., evidence regarding the value of similar transactions.

66. Plaintiffs and Class Members have an interest in ensuring their PII is secured and not subject to further theft because Defendant continues to hold their PII.

## CLASS ACTION ALLEGATIONS

67. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action on behalf of himself and the following proposed Nationwide class, defined as follows:

**Nationwide Class**

> All persons residing in the United States who are current or former customers of TT or any ATT affiliate, parent, or subsidiary, and had their PII compromised by an unknown third-party cybercriminal as a result of the Data Breach.

In addition, Plaintiffs bring this action on behalf of the following proposed Missouri Subclass, defined as follows:

> **<u>Missouri Subclass</u>**
>
> All persons residing in the State of Missouri who are current or former customers of ATT or any ATT affiliate, parent, or subsidiary, and had their PII compromised by an unknown third-party cybercriminal as a result of the Data Breach.

In addition, Plaintiffs bring this action on behalf of the following proposed Kansas Subclass, defined as follows:

> **<u>Kansas Subclass</u>**
>
> All persons residing in the State of Kansas who are current or former customers of ATT or any ATT affiliate, parent, or subsidiary, and had their PII compromised by an unknown third-party cybercriminal as a result of the Data Breach.

68. Both the proposed Nationwide Class and the proposed Missouri and Kansas Subclasses will be collectively referred to as the Class, except where it is necessary to differentiate them.

69. Excluded from the proposed Class are any officer or director of Defendant; any officer or director of any affiliate, parent, or subsidiary of Defendant, and/or anyone employed by counsel in this action; and any judge to whom this case is assigned, his or her spouse, and members of the judge's staff.

70. **Numerosity.** Members of the proposed Class likely number in the millions and are thus too numerous to practically join in a single action. Membership in the Class is readily ascertainable from Defendant's own records.

71. **Commonality and Predominance.** Common questions of law and fact exist as to the proposed Class Members and predominate over questions affecting only individual Class Members. These common questions include:

a. Whether Defendant engaged in the wrongful conduct alleged herein;

b. Whether Defendant's inadequate data security measures were a cause of the Data Breach;

c. Whether Defendant owed a legal duty to Plaintiffs and the other Class Members to exercise due care in collecting, storing, and safeguarding their PII;

d. Whether Defendant negligently or recklessly breached legal duties owed to Plaintiffs and the Class Members to exercise due care in collecting, storing, and safeguarding their PII;

e. Whether Plaintiffs and the Class are at an increased risk for identity theft because of the Data Breach;

f. Whether Defendant failed to implement and maintain reasonable security procedures and practices for Plaintiffs' and Class Members' PII in violation of Section 5 of the FTC Act;

g. Whether Plaintiffs and the other Class Members are entitled to equitable relief, including, but not limited to, injunctive relief and restitution.

72. Defendant engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs, individually, and on behalf of the other Class Members. Similar or identical statutory and common violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quantity and quality, to the numerous questions that dominate this action.

73. **Typicality:** Plaintiffs' claims are typical of the claims of the Members of the Class. All Class Members were subject to the Data Breach and had their PII accessed

by and/or disclosed to unauthorized third parties. Defendant's misconduct affected all Class Members in the same manner.

74. **Adequacy of Representation:** Plaintiffs are adequate representatives of the Class because his interests do not conflict with the interests of the other Class Members they seek to represent; they have retained counsel competent and experienced in complex class action litigation, and Plaintiffs will prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiffs and their counsel.

75. **Superiority:** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this matter as a class action. The damages, harm, or other financial detriment suffered individually by Plaintiffs and the other Class Members are relatively small compared to the burden and expense that would be required to litigate their claims on an individual basis against Defendant, making it impracticable for Class Members to individually seek redress for Defendant's wrongful conduct Even if Class Members could afford individual litigation, the court system could not. Individualized litigation would create a potential for inconsistent or contradictory judgments and increase the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

**COUNT II**
**BREACH OF IMPLIED CONTRACT**

**(On behalf of Plaintiffs and the Nationwide Class and/or the Missouri Subclass and/or the Kansas Subclass)**

76. The preceding factual statements and allegations are incorporated herein by reference.

77. Plaintiffs and the other Class Members, as part of their agreement with Defendant, provided Defendant their PII.

78. Defendant offered services to current or former customers, including Plaintiffs and Class Members, in exchange for monetary payment.

79. As a condition of the purchase, Defendant required Plaintiffs and Class Members to provide their PII, passcodes, Social Security Numbers, email addresses, mailing addresses, phone numbers, and birth dates. Implied in these exchanges was a promise by Defendant to ensure that the PII of Plaintiffs and Class Members in its possession was only used to provide the agreed-upon services from Defendant.

80. These exchanges constituted an agreement between the parties: Plaintiffs and Class Members would provide their PII in exchange for the services provided by Defendant.

81. It is clear by these exchanges that the parties intended to enter into an agreement. Plaintiffs and Class Members would not have disclosed their PII to Defendant but for the prospect of Defendant's promise of providing the services purchased by Plaintiffs and the Class. Conversely, Defendant presumably would not have taken Plaintiffs' and Class Members' PII if it did not intend to provide Plaintiffs and Class Members with the bargained-for services.

82. In providing such PII, Plaintiffs and the other Class Members entered into

an implied contract with Defendant, whereby Defendant became obligated to reasonably safeguard Plaintiffs' and the other Class members' PII.

83. Under the implied contract, Defendant was obligated to not only safeguard the PII, but also to provide Plaintiffs and Class Members with prompt, adequate notice of any Data Breach or unauthorized access of said information.

84. Defendant breached the implied contract with Plaintiffs and the other Class Members by failing to take reasonable measures to safeguard their PII.

85. As a direct result of Defendant's breach of their duty of confidentiality and privacy and the disclosure of Plaintiffs' and the member of the Class confidential personal information, Plaintiffs and the members of the Class suffered damages, including, without limitation, loss of the benefit of the bargain, exposure to heightened future risk of identity theft, increased infiltrations into their privacy through spam and/or attempted identity theft, loss of privacy, loss of confidentiality, embarrassment, emotional distress, humiliation and loss of enjoyment of life.

86. Plaintiffs and the other Class Members suffered and will continue to suffer damages including, but not limited to: (i) the untimely and/or inadequate notification of the Breach; (ii) improper disclosure of their PII; (iii) loss of privacy; (iv) out-of-pocket expenses incurred to mitigate the increased risk of identity theft and/or identity fraud pressed upon them by the Breach; (v) the value of their time spent mitigating identity theft and/or identity fraud and/or the increased risk of identity theft and/or identity fraud; (vi) the increased risk of identity theft; and, (vii) emotional distress. At the very least, Plaintiffs and Class Members are entitled to nominal damages.

**COUNT III**
**NEGLIGENCE**
**(On behalf of Plaintiffs and the Nationwide Class and/or the Missouri Subclass and/or the Kansas Subclass)**

87. The preceding factual statements and allegations are incorporated herein by reference.

88. Defendant owed a duty to Plaintiffs and the Class to exercise reasonable care in obtaining, securing, safeguarding, storing, and protecting Plaintiffs' and Class Members' PII from being compromised, lost, stolen, and accessed by unauthorized persons. This duty includes, among other things, designing, maintaining, and testing its data security systems to ensure that Plaintiffs' and Class Members' PII in Defendant's possession was adequately secured and protected.

89. Defendant owed, and continues to owe, a duty to Plaintiffs and the other Class Members to safeguard and protect their PII.

90. Defendant breached their duty by failing to exercise reasonable care and failing to safeguard and protect Plaintiffs' and the other Class Members' PII.

91. It was reasonably foreseeable that Defendant's failure to exercise reasonable care in safeguarding and protecting Plaintiffs' and the other Class Members' PII would result in an unauthorized third-party gaining access to such information for no lawful purpose.

92. As a direct result of Defendant's breach of their duty of confidentiality and privacy and the disclosure of Plaintiffs' and the members of the Class confidential personal information, Plaintiffs and the members of the Class suffered damages, including, without limitation, loss of the benefit of the bargain, exposure to heightened future risk of identity

theft, increased infiltrations into their privacy through spam and/or attempted identity theft, loss of privacy, loss of confidentiality, embarrassment, emotional distress, humiliation and loss of enjoyment of life.

93. By engaging in the negligent acts and omissions alleged herein, which permitted an unknown third party to access Defendant's systems containing the PII at issue, Defendant failed to meet the data security standards set forth under Section 5 of the FTC Act, which prohibits "unfair…practices in or affecting commerce." This prohibition includes failing to have adequate data security measures, which Defendant has failed to do as discussed herein.

94. Defendant's failure to meet this standard of data security established under Section 5 of the FTC Act is evidence of negligence.

95. Neither Plaintiffs nor other Class Members contributed to the Data Breach as described in this Complaint.

96. Plaintiffs' and the other Class members suffered and will continue to suffer damages including, but not limited to: (i) the untimely and/or inadequate notification of the Breach; (ii) improper disclosure of their PII; (iii) loss of privacy; (iv) out-of-pocket expenses incurred to mitigate the increased risk of identity theft and/or identity fraud pressed upon them by the Breach; (v) the value of their time spent mitigating identity theft and/or identity fraud and/or the increased risk of identity theft and/or identity fraud; (vi) the increased risk of identity theft; and, (vii) emotional distress. At the very least, Plaintiffs and the other Class members are entitled to nominal damages.

97. Defendant's wrongful actions and/or inaction and the resulting Breach (as described above) constituted (and continue to constitute) negligence at common law.

**COUNT IV**
**INVASION OF PRIVACY BY PUBLIC DISCLOSURE OF PRIVATE FACTS**
**(On behalf of Plaintiffs and the Nationwide Class and/or the Missouri Subclass and/or the Kansas Subclass)**

98. The preceding factual statements and allegations are incorporated herein by reference.

99. Plaintiffs' and the other Class Members' PII was (and continues to be) sensitive and personal private information.

100. By virtue of Defendant's failure to safeguard and protect Plaintiffs' and the other Class Members' PII and the resulting Breach, Defendant wrongfully disseminated Plaintiffs' and the other Class Members' PII to unauthorized persons.

101. Dissemination of Plaintiffs' and the other Class Members' PII is not of a legitimate public concern; publicity of their PII was, is and will continue to be offensive to Plaintiffs, the other Class Members, and all reasonable people. The unlawful disclosure of same violates public mores.

102. As a direct result of Defendant's breach of its duty of confidentiality and privacy and the disclosure of Plaintiffs' and the member of the Class confidential personal information, Plaintiffs and the members of the Class suffered damages, including, without limitation, loss of the benefit of the bargain, exposure to heightened future risk of identity theft, increased infiltrations into their privacy through spam and/or attempted identity theft,

loss of privacy, loss of confidentiality, embarrassment, emotional distress, humiliation and loss of enjoyment of life.

103. Plaintiffs and the other Class members suffered and will continue to suffer damages including, but not limited to: (i) the untimely and/or inadequate notification of the Breach; (ii) improper disclosure of their PII; (iii) loss of privacy; (iv) out-of-pocket expenses incurred to mitigate the increased risk of identity theft and/or identity fraud pressed upon them by the Breach; (v) the value of their time spent mitigating identity theft and/or identity fraud and/or the increased risk of identity theft and/or identity fraud; (vi) the increased risk of identity theft; and, (vii) emotional distress. At the very least, Plaintiffs and the other Class Members are entitled to nominal damages.

104. Defendant's wrongful actions and/or inaction and the resulting Breach (as described above) constituted (and continue to constitute) an invasion of Plaintiffs' and the other Class Members' privacy by publicly and wrongfully disclosing their private facts (*i.e.*, their PII) without their authorization or consent.

**COUNT V**
**BREACH OF FIDUCIARY DUTY OF CONFIDENTIALITY**
**(On behalf of Plaintiffs and the Nationwide Class and/or the Missouri Subclass and/or the Kansas Subclass)**

105. Plaintiffs incorporate the foregoing paragraphs as though fully set forth herein.

106. At all times during Plaintiffs' and Class Members' interactions with Defendant as its customers, Defendant was fully aware of the confidential and sensitive

nature of Plaintiffs' and the Class Members' PII that Plaintiffs and Class Members provided to Defendant.

107. Plaintiffs' and Class Members' PII constitutes confidential and novel information. Indeed, Plaintiffs' and Class Members' Social Security numbers can be changed only with great difficulty and time spent, which still enables a threat actor to exploit that information during the interim; additionally, an individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventative action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual ongoing fraudulent activity to obtain a new number.

108. As alleged herein and above, Defendant's relationship with Plaintiffs and Class Members was governed by terms and expectations that Plaintiffs' and Class Members' PII would be collected, stored, and protected in confidence, and would not be disclosed to unauthorized third parties.

109. Plaintiffs and Class Members provided their respective PII to Defendant with the explicit and implicit understandings that Defendant would protect and not permit the PII to be disseminated to any unauthorized parties.

110. Defendant voluntarily received in confidence Plaintiffs' and Class Members' PII with the understanding that the PII would not be disclosed or disseminated to the public or any unauthorized third parties.

111. Due to Defendant's failure to prevent, detect, and avoid the Data Breach from occurring by, *inter alia*, not following best information security practices and by not

providing proper employee training to secure Plaintiffs' and Class Members' PII, Plaintiffs' and Class Members' PII was disclosed and misappropriated to unauthorized third parties beyond Plaintiffs' and Class Members' confidence, and without their express permission.

112. As a direct and proximate cause of Defendant's actions and/or omissions, Plaintiffs and Class Members have suffered damages.

113. But for Defendant's disclosure of Plaintiffs' and Class Members' PII, in violation of the parties' understanding of confidentiality, Plaintiffs' and Class Members' PII would not have been compromised, stolen, viewed, accessed, and used by unauthorized third parties. Defendant's Data Breach was the direct and legal cause of the theft of Plaintiffs' and Class Members' PII, as well as the resulting damages.

114. The disclosure of Plaintiffs' and Class Members' PII constituted a violation of Plaintiffs' and Class Members' understanding that Defendant would safeguard and protect the confidential and novel PII that Plaintiffs and Class Members were required to disclose to Defendant.

115. The concrete injury and harm Plaintiffs and Class Members suffered was the reasonably foreseeable result of Defendant's unauthorized disclosure of Plaintiffs' and Class Members' PII. Defendant knew their data security procedures for accepting and securing Plaintiffs' and Class Members' PII had numerous security and other vulnerabilities that placed Plaintiffs' and Class Members' PII in jeopardy.

116. As a direct and proximate result of Defendant's breaches of confidence, Plaintiffs and Class Members have suffered and/or are at a substantial risk of suffering

from damages including, but not limited to: (i) the untimely and/or inadequate notification of the Breach; (ii) improper disclosure of their PII; (iii) loss of privacy; (iv) out-of-pocket expenses incurred to mitigate the increased risk of identity theft and/or identity fraud pressed upon them by the Breach; (v) the value of their time spent mitigating identity theft and/or identity fraud and/or the increased risk of identity theft and/or identity fraud; (vi) the increased risk of identity theft; and, (vii) emotional distress. At the very least, Plaintiffs and the other Class Members are entitled to nominal damages.

## COUNT VI
## <u>NEGLIGENT TRAINING AND SUPERVISION</u>
**(On behalf of Plaintiffs and the Nationwide Class and/or the Missouri Subclass and/or the Kansas Subclass)**

117. The preceding factual statements and allegations are incorporated herein by reference.

118. At all times relevant hereto, Defendant owed and currently owe a duty to Plaintiffs and the Class to hire competent employees and agents, and to train and supervise them to ensure they recognize the duties owed to their customers.

119. Defendant breached their duty to Plaintiffs and the member of the Class by allowing its employees and agents to give access to customer PII to unauthorized users.

120. As a direct result of Defendant's breach of its duty of confidentiality and privacy and the disclosure of Plaintiffs' and the member of the Class confidential personal information, Plaintiffs and the members of the Class suffered damages, including, without limitation, loss of the benefit of the bargain, exposure to heightened future risk of identity theft, increased infiltrations into their privacy through spam and/or attempted identity theft,

loss of privacy, loss of confidentiality, embarrassment, emotional distress, humiliation and loss of enjoyment of life.

121. Plaintiffs and the other Class members suffered and will continue to suffer damages including, but not limited to: (i) the untimely and/or inadequate notification of the Breach; (ii) improper disclosure of their PII; (iii) loss of privacy; (iv) out-of-pocket expenses incurred to mitigate the increased risk of identity theft and/or identity fraud pressed upon them by the Breach; (v) the value of their time spent mitigating identity theft and/or identity fraud and/or the increased risk of identity theft and/or identity fraud; (vi) the increased risk of identity theft; and, (vii) emotional distress. At the very least, Plaintiffs and the other Class Members are entitled to nominal damages.

122. Defendant's wrongful actions and/or inaction and the resulting Breach (as described above) constituted (and continue to constitute) an invasion of Plaintiffs' and the other Class Members' privacy by publicly and wrongfully disclosing their private facts (*i.e.*, their PII) without their authorization or consent.

**COUNT VI**
**VIOLATIONS OF MISSOURI MERCHANDISING PRACTICES ACT**
**("MMPA"), MO. REV. STAT. § 407.010 et seq.**
**(on behalf of the Missouri subclass)**

1. The preceding factual statements and allegations are incorporated herein by reference.

2. Mo. Rev. Stat. § 407.020 prohibits the use of any "deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce…"

3. An "unfair practice" is defined by Missouri law, Mo. Code Regs. Ann. tit. 15 § 60-8.020, as any practice which:

(A) Either-

1. Offends any public policy as it has been established by the Constitution, statutes or common law of this state, or by the Federal Trade Commission, or its interpretive decisions; or

2. Is unethical, oppressive or unscrupulous; and

(B) Presents a risk of, or causes, substantial injury to consumers.

4. An "unfair practice is defined by Missouri law,

Mo. Code Regs. Ann. tit. 15 § 60-8.020 (1)(B) provides that an "Unfair Practice in General" is

(1) An unfair practice is any practice which –

(A) Either –

1. <u>Offends any public policy</u> as it has been established by the Constitution, <u>statutes</u> or common law of this state, or by the Federal Trade Commission, or its interpretive decisions; or

2. Is unethical, oppressive or unscrupulous; and

(B) Presents a risk of, or causes, <u>substantial injury to consumers</u>.

Mo. Code Regs. Ann. tit. 15 § 60-8.040 provides that an "Unfair Practice is:

An unfair practice for any person in connection with the advertisement or sale of merchandise to violate the duty of good faith in solicitation, negotiation and performance, or in <u>any manner fail to act in good faith</u>.

5. Plaintiffs and the class Members and Defendants are "persons" within the meaning of § 407.010 (5).

6. Merchandise is defined by the MMPA, to include the providing of "services" and, therefore, encompasses healthcare services. Healthcare services are a good.

7. Efforts to maintain the privacy and confidentiality of medical records are part of the healthcare services associated with a good.

8. Maintenance of medical records are "merchandise" within the meaning of section 407.010(4).

9. Plaintiffs' and the Class Members' goods and services purchased from Defendants were for "personal, family or household purposes" within the meaning of the Missouri Merchandising Practices Missouri Revised Statutes.

10. As set forth herein, Defendants' acts, practices and conduct violate section 407.010(1) in that, among other things, Defendants have used and/or continues to use unfair practices, concealment, suppression and/or omission of material facts in connection with the advertising, marketing, and offering for sale of services associated with healthcare services. Such acts offend the public policy established by Missouri statute and constitute an "unfair practice" as that term is used in Missouri Revised Statute § 407.020(1).

11. Defendants' unfair, unlawful, and deceptive acts, practices and conduct include: (1) representing to its patients that it will not disclose their sensitive personal health information to an unauthorized third party or parties; (2) failing to implement security measures such as securing the records in a safe place; (3) failing to train personnel; and (4) charging patients for privacy services which were not provided.

12. Defendants' conduct also violates the enabling regulations for the MMPA because it: (1) offends public policy; (2) is unethical, oppressive and unscrupulous; (3) causes substantial injury to consumers; (4) it is not in good faith; (5) is unconscionable; and (6) is unlawful. *See* Mo Code Regs. Ann tit. 15 § 60-8.

13. As a direct result of Defendants' breach of its duty of confidentiality and privacy and the disclosure of Plaintiffs' confidential medical information, Plaintiff suffered damages, including, without limitation, loss of the benefit of the bargain, exposure to heightened future risk of identity theft, loss of privacy, confidentiality, embarrassment, humiliation, and loss of enjoyment of life.

14. As a direct and proximate cause of Defendants' unfair and deceptive acts, Plaintiffs and the class Members suffered damages in that they (1) paid more for medical record privacy protections than they otherwise would have, and (2) paid for medical record privacy protections that they did not receive. In this respect, Plaintiffs and the class Members have not received the benefit of the bargain and have suffered an ascertainable loss.

15. Plaintiffs and the class Members seek actual damages for all monies paid to Defendants in violation of the MMPA. In addition, Plaintiffs and the class Members seek attorneys' fees.

**COUNT VIII**
**BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING**
**(On behalf of Plaintiffs and the Nationwide Class and/or the Missouri Subclass and/or the Kansas Subclass)**

123. Plaintiffs incorporate the foregoing paragraphs as though fully set forth herein.

124. As described above, when Plaintiffs and the class Members provided their PII to Defendant, they entered into implied contracts in which Defendant agreed to comply with its statutory and common law duties and industry standards to protect Plaintiffs' and Class Members' PII and to timely detect and notify them in the event of a data breach.

125. These exchanges constituted an agreement between the parties: Plaintiffs and Class Members were required to provide their PII in exchange for services provided by Defendant as well as an implied covenant by Defendant to protect Plaintiffs' PII in its possession.

126. It was clear by these exchanges that the parties intended to enter into an agreement. Plaintiffs and Class Members would not have disclosed their PII to Defendant but for the prospect of Defendant's promise of certain services. Conversely, Defendant presumably would not have taken Plaintiffs' and Class Members' PII if it did not intend to provide Plaintiffs and Class Members with the services it was offering.

127. Implied in these exchanges was a promise by Defendant to ensure that the PII of Plaintiffs and Class Members in its possession was only used to provide the agreed-upon services.

128. Plaintiffs and Class Members therefore did not receive the benefit of the bargain with Defendant, because they provided their PII in exchange for Defendant's implied agreement to keep it safe and secure.

129. While Defendant had discretion in the specifics of how they met the applicable laws and industry standards, this discretion was governed by an implied covenant of good faith and fair dealing.

130. Defendant breached this implied covenant when it engaged in acts and/or omissions that are declared unfair trade practices by the FTC and state statutes and regulations. These acts and omissions included: omitting, suppressing, and concealing the material fact of the inadequacy of the privacy and security protections for Plaintiffs' and Class Members' PII; storing the PII of former customers, despite any valid purpose for the storage thereof having ceased upon the termination of the business relationship with those individuals; and failing to disclose to Plaintiffs and Class Members at the time they provided their PII to it that Defendant's data security systems failed to meet applicable legal and industry standards.

131. Plaintiffs and Class Members did all or substantially all the significant things that the contract required them to do.

132. Likewise, all conditions required for Defendant's performance were met.

133. Defendant's acts and omissions unfairly interfered with Plaintiffs' and Class Members' rights to receive the full benefit of their contracts.

134. Plaintiffs and Class Members have been or will be harmed by Defendant's breach of this implied covenant in the many ways described above, including actual identity theft and/or imminent risk of certainly impending and devastating identity theft that exists now that cyber criminals have their PII, and the attendant long-term expense of attempting to mitigate and insure against these risks.

135. Defendant is liable for its breach of these implied covenants, whether or not it is found to have breached any specific, express contractual term.

136. Plaintiffs and Class Members are entitled to damages, including compensatory damages and restitution, declaratory and injunctive relief, and attorneys' fees, costs, and expenses.

## COUNT IX
## DECLARATORY AND INJUNCTIVE RELIEF
**(On behalf of Plaintiffs and the Nationwide Class and/or the Missouri Subclass and/or the Kansas Subclass)**

137. Plaintiffs incorporate the foregoing paragraphs as though fully set forth herein.

138. This Count is brought under the federal Declaratory Judgment Act, 28 U.S.C. § 2201.

139. As previously alleged, Plaintiffs and Class Members entered into an implied contract that required Defendant to provide adequate security for the PII it collected from Plaintiffs and Class Members.

140. Defendant owes a duty of care to Plaintiffs and Class Members requiring it to adequately secure their PII.

141. Defendant still possesses Plaintiffs' and Class Members' PII.

142. Since the Data Breach, Defendant has announced few, if any, changes to its data security infrastructure, processes, or procedures to fix the vulnerabilities in its computer systems and/or security practices which permitted the Data Breach to occur and, thereby, prevent future attacks.

143. Defendant has not satisfied its contractual obligations and legal duties to Plaintiffs and Class Members, in fact, now that Defendant's insufficient data security is known to hackers, the PII in Defendant's possession is even more vulnerable to cyberattack.

144. Actual harm has arisen in the wake of the Data Breach regarding Defendant's contractual obligations and duties of care to provide security measures to Plaintiffs and Class Members. Further, Plaintiffs and Class Members are at risk of additional or further harm due to the exposure of their PII and Defendant's failure to address the security failings that led to such exposure.

145. There is no reason to believe that Defendant's security measures are any more adequate now than they were before the Data Breach to meet Defendant's contractual obligations and legal duties.

146. Plaintiffs, therefore, seek a declaration (1) that Defendant's existing security measures do not comply with its contractual obligations and duties of care to provide adequate security, and (2) that to comply with its contractual obligations and duties of care, Defendant must implement and maintain reasonable security measures, including, but not limited to:

a. Ordering that Defendant engages third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

b. Ordering that Defendant engages third-party security auditors and internal personnel to run automated security monitoring;

c. Ordering that Defendant audits, tests, and trains its security personnel regarding any new or modified procedures;

d. Ordering that Defendant segments data by, among other things, creating firewalls and access controls so that if one area of Defendant's systems is compromised, hackers cannot gain access to other portions of Defendant's systems;

e. Ordering that Defendant purges, deletes, and destroys in a reasonably secure manner customer data not necessary for its provisions of services;

f. Ordering that Defendant conducts regular computer system scanning and security checks;

g. Ordering that Defendant routinely and continually conducts internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach; and

h. Ordering Defendant to meaningfully educate its current, former, and prospective customers about the threats they face as a result of the loss of their PII to third parties, as well as the steps they must take to protect themselves.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the other members of the Class proposed in this Petition, respectfully request that the Court enter judgment in their favor and against Defendant, as follows:

A. Declaring that this action is a proper class action, certifying the Class as requested herein, designating Plaintiffs as Class Representatives and appointing Plaintiffs' counsel as Lead Counsel for the Class;

B. Declaring that Defendant's conduct was extreme and outrageous;

C. Declaring that Defendant breached their implied contract with Plaintiffs and Class Members;

D. Declaring that Defendant negligently disclosed Plaintiffs' and the Class

Members PII;

E. Declaring that Defendant has invaded Plaintiffs' and Class Members' privacy;

F. Declaring that Defendant breached their implied contract with Plaintiffs and the Class Members;

G. Declaring that Defendant was negligent by negligently training and supervising its employees and agents;

H. Declaring that Defendant violated the Missouri Merchandising Practices Act;

I. Ordering Defendant to pay actual damages to Plaintiffs and the Class Members;

J. Ordering Defendant to properly disseminate individualized notice of the Breach to all Class Members;

K. For an Order enjoining Defendant from continuing to engage in the unlawful business practices alleged herein;

L. Ordering Defendant to pay attorneys' fees and litigation costs to Plaintiffs;

M. Ordering Defendant to pay both pre- and post-judgment interest on any amounts awarded; and

N. Ordering such other and further relief as may be just and proper.

## **JURY DEMAND**

Plaintiffs respectfully demand a trial by jury on all of his claims and causes of action so triable.

Respectfully submitted,

Maureen M. Brady MO#57800
Lucy McShane MO#57957
McShane & Brady, LLC
1656 Washington Street, Suite 120
Kansas City, MO 64108
Telephone: (816) 888-8010
Facsimile: (816) 332-6295
E-mail: mbrady@mcshanebradylaw.com
lmcshane@mcshanebradylaw.com
**ATTORNEYS FOR PLAINTIFFS**